UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
AVRIL OSBORNE,
                    Plaintiff,

        -against-                              04 Civ. 6652 (DAB)
                                               MEMORANDUM & ORDER

LITERACY PARTNERS, INC.,
                    Defendant.
-----------------------------------X
DEBORAH A. BATTS, United States District Judge.

        Plaintiff Avril Osborne ("Plaintiff") has brought this suit

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e, et seq. ("Title VII"), claiming that she was terminated

from her job at Defendant Literacy Partners, Inc. ("Defendant" or

"LPI") because of her race and color.  Now before this Court is

Defendant's Motion for Summary Judgment.  For the reasons

contained herein, Defendant's Motion is GRANTED.


                        I. BACKGROUND

        At the outset, the Court notes the dearth of evidence that

has been submitted.  Defendant submitted only a copy of Plaintiff

Avril Osborne's deposition transcript to supplement its Rule 56.1

Statement and its Memorandum of Law in Support of its Motion for

Summary Judgment.  In response, Plaintiff filed a two-page

Affirmation in Opposition

                            1

of Motion which disputes four facts from Defendant's Memorandum.[1]
No other documents or records have been submitted to the Court on
this Motion.

 Defendant LPI is a non-profit organization that provides
literacy and other educational services to adults. (Def.'s Memo.
of Law at 3.) Plaintiff, who identifies her race as
"Mulatto/Black" and her color as "light brown" (See Compl. ¶ 7;
see also 39:21 - 40:20) began her employment at LPI in August of
1998 as a full-time Coordinator. (Id. 35:13-24.) In January of
2001, she was promoted to Supervisor. (Id. 36:4-10.) LPI
promoted her again in July of 2002 to Manager of Family Literacy,
and gave her a $2,000 raise. (Id. 36:18 - 37:5.) Though the
latter promotion had been scheduled by then-CEO Jon Deveaux, (id.
81:8-11), Debra Lynne ("Lynne"), who replaced Deveaux, was the
person who actually effectuated the promotion (id. 38:17 -
39:14).

 Over the course of her term at LPI, Plaintiff witnessed
conduct by other employees which she considered racially
offensive. For example, she described as "exploitative" the
decision to showcase only LPI's students of color at fundraisers.

---

[1] Defendant served Plaintiff with a 56.2 Notice pursuant to
Local Rule 56.2, which requires movants to notify pro se
litigants of their rights and obligations when opposing summary
judgment motions. (See Attachment to Def.'s Mem. of Law.)

(<u>Id.</u> 43:11 - 45:18.)  She also found offensive employees who referred to LPI's students as "those people" (<u>id.</u> 73:17-24), and who commented that "our tutors have to be kept safe and protected, because we don't know, you know, who our students are" (<u>id.</u> 48:19-25).  In Plaintiff's words, these comments were offensive because "when most of the students are of color and most of the tutors are white, it's kind of an understanding – the picture that you get is of, you know, we have to protect the whites from the blacks."  (<u>Id.</u> 49:1-7.)  Despite Plaintiff's assertion that most of the tutors were white, she was unable to cite any particular policy permitting only white people to volunteer for LPI.[2]  (<u>Id.</u> 53:9-16.)  She did, however, argue at her deposition that LPI should have taken steps to recruit a more diverse pool of tutors.  (<u>Id.</u>)

Plaintiff also recalled at her deposition a time when LPI did not ask for her help with organizing a fundraiser.  (<u>Id.</u> 68:13-24.)  Instead, Plaintiff was asked only to remove a loud child from the premises.  (<u>Id.</u> 68:25 - 69:25.)  She stated that this request was made of her in a "condescending" manner.  (<u>Id.</u>) Despite feeling under-involved at this fundraiser, Plaintiff also

---

[2] She also has conceded that other people of color were hired to work at LPI during her tenure there.  (Osborne Dep. 83:16-19.)

3

has asserted that she was overworked during her tenure at LPI. (Id. 245:4-16.)  She noted, however, that LPI employees of all races and colors were overworked.  (Id.)  She also noted that other employees, including white employees, were terminated when she worked there.  (Id. 137:3 - 138:22.)  Despite each of Plaintiff's concerns about her employer's allegedly discriminatory conduct, she testified that she never filed a complaint pursuant to her employer's complaint procedure even though she had received a handbook which explained how to file internal complaints about discrimination.  (Id. 236:19 - 237:14.)

Plaintiff's relationship with Debra Lynne, her supervisor, was sometimes hostile.  Plaintiff recalled at her deposition an incident when Lynne was moving a table and accidentally hit Plaintiff with it.  Lynne did not apologize to Plaintiff, but instead yelled at her, and told her that she should not have been standing where she was.  (Id. 77:1-9.)  Plaintiff opined at her deposition on the reason for Lynne's alleged hostility toward her, suggesting that it may have been "based on race".  (Id. 79:2-5.)  Plaintiff also suggested that Lynne's hostility may have stemmed from her feeling threatened by Plaintiff's excellent job performance.[3]  (Id. 78:4-7.)

_____

[3] Yet Plaintiff acknowledges she may have received unsatisfactory job evaluations.  (Dep. 205-06.)

**4**

When pressed at her deposition, however, Plaintiff stated that no specific comment or comments created a racially hostile environment, but that there was an overall air of racism: "Well, I think the context is not necessarily can be separated out as comments [sic], but the environment in entirety . . . ." (Id. 52:7-9.)

On November 15, 2002, Plaintiff was terminated.[4] (Id. 141:13-15.)  Her termination was effectuated by Lynne (id. 145:4-8), and was enforced the same day that she was notified of it (id. 26:17-24).  The reasons cited for the termination were financial and structural.  According to Plaintiff:

> I think the exact words were that the staffing in the family literacy program is not working and we're changing it.  And I was also told at that time that, for the record, it would say that the reason for my termination was organizational restructuring and financial constraints of the organization.

(Id. 129:11-19.)  Indeed, LPI suffered in 2002 a twenty-five percent budget cut, resulting in fewer office supplies and a decrease in support staff.  (Id. 33:22 - 34:16, 203:18 - 205:4.)

_____

[4] Page 32 of Osborne's Deposition indicates that Plaintiff was terminated on October 15, 2002, but the Complaint, Defendant's Memorandum of Law, and other parts of her Deposition indicate that she was terminated on November 15, 2002.  (Compl. ¶ 8; Def.'s Mem. of Law at 4; Osborne Dep. 141:13-15.)  The exact date of the termination is not relevant to this Motion.

5

Plaintiff's belief that LPI's reasons were pretextual stemmed from an announcement allegedly made at a staff meeting that LPI needed a "more professional" staff.  (<u>Id.</u> 134:25 – 135:22.)  Though Plaintiff was not present at that meeting, she asserted that this statement was "significant":

> I can think that as far as this claim of racial discrimination, when you've just fired someone who is claiming racial discrimination and then you're hiring someone else for the position who is of a different race, that – what I'm saying is she hired a white woman and to say I'm hiring a more professional staff, I thought that was significant.

(<u>Id.</u> 135:14-22.)

Plaintiff stated that a white woman was hired to replace her, but she did not know who she was, nor did she know the terms of her replacement's employment or even whether that person's classification as a "replacement" was appropriate in the first instance.  (<u>Id.</u> 132:2-22.)  Defendant counters that Plaintiff was not replaced per se, but that the Associate Director of Education position was upgraded for the new hiree while Plaintiff's Manager of Family Literacy position was eliminated.  (Def.'s Mem. of Law at 3.)  Defendant, however, does not cite to any document to corroborate its contention.

By the end of November 2002, Plaintiff was hired as a temporary employee by the Brooklyn Bureau of Community Services, where she earned a higher salary than she had at LPI.  (Osborne

Dep. 222:19 - 223:3; 255:10 - 257:3.)  By January 2003, she was
working full-time.  (Osborne Dep. 215:23 - 216:3.)

Plaintiff filed a claim with the EEOC, and then received a
Notice of Right to Sue on July 9, 2004.  On August 17, 2004 –
within the requisite time period – Plaintiff filed the present
suit.

## II. DISCUSSION

A.  Summary Judgment Standard

A district court should grant summary judgment when there is
"no genuine issue as to any material fact," and the moving party
is entitled to judgment as a matter of law.  Fed. R. Civ. P.
56(c); see also Hermes Int'l v. Lederer de Paris Fifth Ave.,
Inc., 219 F.3d 104, 107 (2d Cir. 2000).  Genuine issues of
material fact cannot be created by mere conclusory allegations;
summary judgment is appropriate only when, "after drawing all
reasonable inferences in favor of a non-movant, no reasonable
trier of fact could find in favor of that party."  Heublein v.
United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing
Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S.
574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

In assessing when summary judgment should be granted, "there
must be more than a 'scintilla of evidence' in the non-movant's

favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  While a court must always "resolv[e] ambiguities and draw[ ] reasonable inferences against the moving party," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson), the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Id. at 12.  Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'" Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (quoting Fed. R. Civ. P. 56(e)).  Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).  Unsupported allegations in the pleadings thus cannot create a material issue of fact.  Id.

B.  Title VII Claim

Most claims of unlawful employment discrimination under Title VII are analyzed according to the familiar burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S.

792, 798 (1973).  Under McDonnell Douglas, the plaintiff bears
the initial burden of establishing a prima facie case of
discrimination through direct or circumstantial evidence.
Windham v. Time Warner, Inc., 275 F.3d 179, 187 (2d Cir. 2001).
The plaintiff's burden at this stage is de minimis, and the
requirement of meeting this burden "is neither onerous, nor
intended to be rigid, mechanized or ritualistic." Abdu-Brisson v.
Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001) (internal
quotations and citations omitted).  To make out a prima facie
discrimination claim, a plaintiff must demonstrate: (1) that he
or she is a member of a protected class; (2) that he or she is
qualified for the position in question; (3) that he or she
suffered an adverse employment action; and that (4) the
circumstances surrounding the adverse action give "rise to an
inference of discrimination." Windham, 275 F.3d at 187 (citation
omitted).

     A plaintiff who is able to make out a prima facie case
establishes a presumption of discrimination and the burden of
production shifts to the defendant.  See Woodman v. WWOR-TV,
Inc., 411 F.3d 69, 76 (2d Cir. 2005).  The defendant must meet
this burden by articulating a reason for the challenged conduct
that "taken as true, would permit the conclusion that there was a
nondiscriminatory reason for the adverse action." St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) (emphasis in
original).

If the defendant is able to present a non-discriminatory
explanation for the challenged conduct, "the presumption of
discrimination drops out" and the burden of proof shifts back to
the plaintiff.  Woodman, 411 F.3d at 76 (citation omitted).  The
plaintiff must then prove "that the legitimate reasons offered by
the defendant were not its true reasons, but were a pretext for
discrimination."  Reeves v. Sanderson Plumbing Prods., Inc., 530
U.S. 133, 143 (2000) (quotations and citations omitted).  In
showing that the employer's explanation was pretextual, the
plaintiff need not prove that the explanation offered by the
employer was entirely false "but only that its stated reason was
not the only reason" and that consideration of an impermissible
factor "did make a difference."  Montana v. First Federal Sav. &
Loan Ass'n of Rochester, 869 F.2d 100, 105 (2d Cir. 1989).

Plaintiff has satisfied only three of the four prongs of a
prima facie case.  Her race and color place her in a protected
class (first prong); her series of promotions, her subsequent
comparable employment at the Brooklyn Bureau of Community
Services, and the stated non-performance reason for her
termination show that she was qualified to work there (second

10

prong); and her termination was an adverse employment action (third prong).

But she has not described circumstances that would give rise to an inference of discrimination (fourth prong).  Not only was she promoted at least twice prior to her termination (see Osborne Dep. 36:4 - 37:5), but she also conceded that employees of different races - including white employees - were discharged from LPI during her tenure there (id. 137:3 - 138:22).  Moreover, her own testimony belies her argument that a white woman took over her position:

    Q.   You weren't an assistant director, were you?

    A.   No.

    Q.   What does the hiring of a white woman in the
         position of assistant director have to do with
         your termination?

    A.   I think it has to do with the fact that they
         were hired in a position to do the work that I
         was doing, but with a different title and
         position obviously.

    Q.   How do you know that a white woman was hired
         to do the work that you were doing with a
         different title?

    A.   That's what I was told.  Somebody had to do it
         and my understanding is that this is - that
         this woman was hired to do it.

    .  .  .  .

    Q.   Well, do you know what duties this white woman
         performed?

11

A.    I don't know all the duties.  Usually, the job
      is combined.

Q.    I'm asking what duties you know she performed.

A.    Well, the duties that would be necessary –

Q.    Not the duties that would be necessary to be
      performed, the duties that you would know that
      she performed.

A.    Oh, I don't know anything.

. . . .

Q.    You're . . . assuming that this white woman
      who was hired into the position of assistant
      director  performed   the  duties  that  you
      performed; is that correct?

A.    Parts of that is [sic] correct.  I do assume
      that she is performing some of the duties that
      I performed.

Q.    And  do  you  know  of  any  duties  that  she
      performed that you performed by virtue of your
      observations?

A.    No.

Q.    So you only know from assumptions; is that
      correct?

A.    And hearsay.

Q.    Assumptions and hearsay?

A.    Correct.

(Id. 180:12 – 183:8.)  A party may not oppose a summary judgment

motion with mere speculation and conjecture.  Knight v. U.S. Fire

Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).  See also Capobianco v.

City of New York, 422 F.3d 47, 55 (2d Cir. 2005) (hearsay is an
insufficient basis for opposing summary judgment).  Neither this
hearsay nor Plaintiff's conclusions from that hearsay are
admissible evidence, and therefore they may not be used to create
an inference of discrimination.

     At her deposition, Plaintiff referred to several comments
which, according to her, were tinged with racial hostility (see,
e.g., id. 48:19 - 49:7, 53:9-16), but none of those comments
related to her termination.  She cited no hostile comment made by
an LPI employee which referenced her race – or, for that matter,
which referenced race in general.  Her contention that LPI's wish
to hire "more professional" employees was code for a wish to hire
"more white" employees is meritless not only because she did not
hear the "more professional" comment directly (see id. 135:2-8),
but also because she has not proffered admissible demographics
about the other employees who were terminated during the budget
cuts.  There is absolutely no link to be inferred between
Plaintiff's race and her termination.  Cf. Montanile v. National
Broadcasting Co., 57 Fed. Appx. 27, 29, 30 n.1 (2d Cir. 2005)
(affirming district court ruling that no inference of
discrimination attached where plaintiff "received consistently
favorable treatment" throughout her employment and where "there
was nothing linking the changes in plaintiff's work environment

13

and her ineligibility for overtime to either her sex or her desire to start a family"); Molnar v. Pratt & Whitney, 63 Fed. Appx. 528 (2d Cir. 2002) (applying McDonnell Douglas framework to ADEA suit to conclude that no inference of age discrimination could be found where younger employees who had worked for a longer period of time at defendant business were promoted over plaintiff and where a colleague who had no effect on promotion decisions had asked plaintiff about his age); Napier v. Town of Hempstead, 152 F.3d 919, 919 (2d Cir. 1998) (no inference of discrimination where, among other things, African-American employee's allegation that similarly situated white employees were treated differently than he was were unsupported by the record).

Especially detrimental to Plaintiff's claim is the fact that the very same person who terminated her – her supervisor and CEO, Debra Lynne – had promoted her to Manager of Family Literacy four months earlier.  That a supervisor who promoted an employee would discharge that employee shortly thereafter for a race-based reason is not credible.  As the Second Circuit has stated: "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.  This is especially so when the firing has

occurred only a short time after the hiring." <u>Grady v.</u>
<u>Affiliated Cent., Inc.</u>, 130 F.3d 553, 560 (2d Cir. 1997).   <u>Cf.</u>
<u>Renz v. Grey Advertising, Inc.</u> 135 F.3d 217, 224 (2d Cir. 1997)
(discounting possibility of discrimination where same supervisor
who hired plaintiff later fired her); <u>Hauptman v. Concord</u>
<u>Fabrics, Inc.</u>, 1999 WL 527970, at *6 (S.D.N.Y. 1999) (granting
summary judgment to employer where employee was hired and
terminated by the same supervisor, and where that supervisor had
authorized a salary and benefits increase for employee just two-
and-a-half years prior to his termination).

Moreover, Plaintiff admitted that she never filed a
complaint pursuant to Defendant's complaint procedures, even
though she received a handbook outlining those procedures.
(Osborne Dep. 236:19 - 237:14.)   That she never saw the need to
file an internal complaint, even if she thought such a complaint
would not have been "well received" (Osborne Dep. 237:11),
signifies that she did not believe that discrimination was a
substantial problem while she worked there.   <u>Cf. Dobrynio v.</u>
<u>Central Hudson Gas & Elec. Corp.</u>, 419 F. Supp. 2d 557, 565
(S.D.N.Y. 2006) (finding that employment discrimination
plaintiff's failure to utilize employer's internal complaint
procedures was factor weighing against inference of
discrimination).   For these reasons, Plaintiff has not raised an

15

inference of discrimination as required by <u>McDonnell Douglas</u>'
fourth prong, and therefore does not make out a prima facie case
for workplace discrimination.

    Even had Plaintiff satisfied all of the prima facie case
requirements, she has not shown that LPI's financial and
structural motivations for terminating her were illegitimate or
pretextual.  She conceded at her deposition that LPI had been
experiencing significant budgetary and staff cutbacks in 2002.
(Osborne Dep. 33:22 – 34:16, 203:18 – 205:4.)  <u>Cf.</u> <u>Calabritto v.</u>
<u>Dillon</u>, 107 F.3d 2, 1997 WL 76863, at *2 (2d Cir. 1997) (finding
that budget cuts were a legitimate reason for terminating
employment, regardless of whether the employee's salary
"significantly decrease[d] the projected financial shortfall").
Plaintiff's perception that other LPI employees harbored racial
prejudices does not counter the fact that LPI laid off employees
because it was suffering financial losses.  <u>Cf.</u> <u>Tadros v.</u>
<u>Brooklyn Developmental Ctr.</u>, 1996 WL 606536, at *2 (2d Cir. 1996)
(finding that a list of incidents in which plaintiff employee was
treated unfairly did not rebut employer's argument that there had
been an overall reduction in its workforce).

    The allegedly abrupt nature of her termination is equally
insufficient to show that LPI's financial and structural motives
were pretextual, especially because Plaintiff has not proffered

16

admissible evidence pertaining to the circumstances of other
employees' terminations.  Cf. Feingold v. New York, 366 F.3d 138,
156 n.18 (2d Cir. 2004) ("[Plaintiff's] argument that a
reasonable fact-finder could conclude that the rationale was
pretextual because the manner in which he was fired did not
comport with the [employer's] normal practice is without support.
[Plaintiff] does not provide any meaningful evidence of the
'general policy' he alleges.").

        Nor does Plaintiff establish, as is required in mixed-motive
cases, that race was one motivation among other legitimate
motivations for her termination.  In mixed-motive cases, if a
plaintiff establishes that a prohibited discriminatory factor
played a "motivating part" in a challenged employment decision,
the burden shifts to the employer to prove by a preponderance of
the evidence that it would have made the same decision anyway.
Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989) (plurality
opinion).  A plaintiff must be able to produce a "smoking gun" or
at least a "thick cloud of smoke" to support her allegations of
discriminatory treatment in order for the burden to shift to a
defendant.  Raskin v. The Wyatt Company, 125 F.3d 55, 61 (2d Cir.
1997) (quoting Fields v. New York State Office of Mental
Retardation and Developmental Disabilities, 115 F.3d 116, 124 (2d
Cir. 1997).  Evidence that calls for a shift in burden under the

                                    17

<u>Price Waterhouse</u> analysis includes policy documents and evidence of statements or actions by decision-makers "that may be viewed as directly reflecting the alleged discriminatory attitude." <u>Ostrowski v. Atlantic Mut. Ins. Cos.</u>, 968 F.2d 171, 182 (2d Cir. 1992).

Plaintiff has provided no policy statements and no statements or actions by decision-makers that implicate race.  In fact, Plaintiff admitted that she knows of no formal policy of discrimination against tutors of color.  (Osborne Dep. 53:9-16.) True, Plaintiff stated that Lynne spoke to her in a "nasty" and "condescending" manner (<u>id.</u> 79:18, 79:19), but Plaintiff did not elaborate on what Lynne's tone had to do with her termination or her race by, for example, showing that Lynne used a similar tone with other terminated employees or other employees of color but not with retained or white employees.  Plaintiff has not submitted any document which sets forth the particular demographics of terminated employees, she has proffered no pre-termination evaluations of her performance, and she has not offered evidence of any express or implicit policy of discrimination.  There was no improper motive for Plaintiff's termination.

It is worth noting that Plaintiff only has alleged discrimination based on her termination, and has not sought

18

recovery for any alleged hostile work environment.  But based on the record, any hostile work environment claim also would not succeed.  In order to prevail on a hostile work environment claim, a plaintiff must show "that [her] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter conditions of [her] work environment", and that "a specific basis exists for imputing the conduct that created the hostile work environment to the employer".  <u>Schwap v. Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997) (<u>quoting</u> <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 715 (2d Cir. 1996)).  Plaintiff's having deemed as "offensive" certain statements by LPI employees which did not expressly reference race (<u>see</u> Osborne Dep. 51:9-17) does not create a severely or pervasively intimidating work environment.  What is more, none of those comments can be imputed on any person who exercised authority over Plaintiff or on any person who had the authority to stop the comments.  Any claim by Plaintiff that she worked in a hostile environment would be meritless.


<u>III. CONCLUSION</u>

        For the foregoing reasons, Defendant's Motion for Summary Judgment is hereby GRANTED.

The Clerk of Court is directed to CLOSE the docket in this case.

SO ORDERED.

DATED:     New York, New York

August 9, 2007

Deborah A. Batts
United States District Judge